UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

STEPHANIE MASLIN,                                :

              Plaintiff,                           :

      -against-                              : **REPORT AND RECOMMENDATION**

                     :  11 Civ. 8709 (JPO) (KNF)

CAROLYN W. COLVIN,[1] Acting Commissioner
of Social Security,                              :

           Defendant.                       :
------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE J. PAUL OETKEN, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

      Stephanie Maslin ("Maslin") commenced this action pro se against the Commissioner of

Social Security ("Commissioner") seeking review of an administrative law judge's ("ALJ")

determination that Maslin is ineligible for disability insurance benefits, pursuant to Title II of the

Social Security Act ("SSA"), 42 U.S.C. §§ 401 et seq. Before the Court is the Commissioner's

motion for judgment on the pleadings, made pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  Maslin opposes the motion.

## BACKGROUND

### Procedural History

      Maslin filed an application for disability insurance benefits on January 31, 2010.  (Tr.

139-40).[2]  Her application was denied.  (Tr. 64-71).  Maslin testified at a hearing before an

---

[1]The caption is amended to substitute Carolyn W. Colvin for Michael J. Astrue; Colvin became
the Acting Commissioner of Social Security on February 14, 2013.  See Fed. R. Civ. P. 25(d).

[2]"Tr." refers to the administrative record that the Commissioner filed as part of her answer, as
required by 42 U.S.C. § 405(g).

administrative law judge ("ALJ") on March 24, 2011. (Tr. 39-63). Maslin was represented by counsel at the hearing. (Tr. 41). On April 29, 2011, the ALJ found that Maslin was not disabled because she has the residual functional capacity to perform the full range of sedentary work and, although she is unable to perform her past work, there is a significant number of jobs in the national economy that she can perform. (Tr. 12-31). Maslin requested a review by the Appeals Council of the ALJ's decision (Tr. 36-38). That request was denied on September 23, 2011, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8). This action followed. Maslin alleges that she became disabled as of February 9, 2009, due to left foot pain and a condition known as reflex sympathetic dystrophy ("RSD") (Tr. 146).[3]

### Non-Medical Evidence

Maslin was born on April 6, 1980. (Tr. 30). At the time of the ALJ's hearing, Maslin was 30 years old. (Tr. 45). Maslin graduated from college (Tr. 147) and obtained a graduate degree in psychology, early childhood and special education. (Tr. 45). Maslin was employed as a teacher from 2002 until 2009. (Tr. 148, 177). In her job, Maslin walked and stood for six hours a day, sat for one hour a day and lifted up to 50 pounds. (Tr. 178). Her job required the use of a computer and knowledge of certain computer programs and involved writing report cards. (Tr. 178). Maslin is unmarried. (Tr. 139).

At the hearing held before the ALJ, Maslin testified that she suffered from a work-related injury in 2006. (Tr. 46). On that occasion, Maslin fell while on a school bus and as a result hurt

---

[3]Reflex sympathetic dystrophy, also known as reflex sympathetic dystrophy syndrome, is a "chronic condition characterized by severe burning pain accompanied by swelling, excessive sweating and extreme sensitivity to touch, pressure, motion or temperature change." American Medical Association Complete Medical Encyclopedia 1057 (Jerrold B. Leikin, M.D. & Martin S. Lipsky, M.D., eds., 2003).

her back, neck, shoulders, knees and right hand.  She testified that, following the accident, she had herniated disks in her neck, back and shoulders.  Maslin took some time off from work after her injury, then returned to work. (Tr. 46).  Maslin testified that she left work for the second time in February 2009.  On that occasion she left work in order to have surgery on her left foot; during the surgery two nerves were removed but the surgery was unsuccessful. She had a second surgery in April 2009.  Maslin testified that after the second surgery her foot was not healing properly and she was diagnosed with RSD.  (Tr. 47).

Maslin testified that following the second surgery her foot turned purple and blue, and was freezing cold and swollen.  (Tr. 47).  Maslin testified that she had pain and numbness and was unable to place her foot flat on the ground.  Maslin wears a surgical shoe.  Maslin testified that she now has symptoms in both feet and hands, as well as her nose and legs. She testified that she gets pains in these areas.  (Tr. 48).  Maslin testified that her pain level on a scale of one to ten was nine and one-half.  Maslin testified that she took medication for the pain, including Soma, Pamelor, Zebeta, Ryzolt, Tramadel and Ambien.  (Tr. 50).

Maslin testified that she also received heart medication because one of the other medications she takes makes her heart race.  Maslin also reported that she suffers from fibromyalgia.[4]  Maslin reported that she was not receiving any treatment for her mental condition, and that she was anxious sometimes but not depressed.  She reported that she has sleep problems and has been prescribed Ambien for that condition.  (Tr. 51-53).

---

[4]Fibromyalgia is "[a] common condition that produces stiffness and pain in the fibrous tissues deep in the muscles.  Aching and fatigue along with a slight swelling of the muscles may also be symptoms."  American Medical Association Complete Medical Encyclopedia 563 (Jerrold B. Leikin, M.D. & Martin S. Lipsky, M.D., eds., 2003).

Maslin also testified that she can lift one gallon of milk from a counter with two hands, and that she could pick up things, but could only type or write for a limited period because her hands stop working. (Tr. 53). Maslin reported that she can walk for only five minutes without taking a break because she cannot put weight on her left foot. (Tr. 54-55).

Maslin testified that she is able to hold a brush, cook, and do small loads of laundry and light shopping. She reported that she has a cleaning lady and tries to go out and see friends but there are days when she cannot leave the house. She has short term memory difficulties. She has a driver's license and a car. She wears only orthopedic shoes. (Tr. 56-60).

Maslin reported that worker's compensation covered the costs associated with her back, neck and shoulder appointments and her medications, but that her savings were dwindling because she was paying for medical insurance. (Tr. 60).

***Medical Evidence***

The Metropolitan Foot Group

On February 10, 2009, Maslin underwent surgery on her left foot. The operation was performed by podiatrist Keri Lee, D.P.M., and consisted of the removal of a neuroma, or tumor, from her left foot; the operative report described the operation as "[e]xcision of neuroma x2 sites with transfer of nerve stem to adjacent muscle." Maslin is reported to have tolerated all aspects of the procedure and anesthesia well. Maslin was given crutches and a postoperative shoe along with instructions for postoperative care. (Tr. 377-378, 487-88, 537-38, 606-07).

On April 21, 2009, podiatrist Michael Loshigian, D.P.M., performed a second surgery on Maslin's left foot; during the surgery the following procedures were performed: revision of postoperative wound dehiscence; removal of deep absorbable suture material; exploration of the

wound and biopsy; and injection of platelet rich plasma concentrate.  Maslin is reported to have tolerated all aspects of the procedure and anesthesia well.  (Tr. 604-605).

On May 19, 2009, Maslin underwent a magnetic resonance imaging ("MRI") scan of her left foot.  On that occasion, Maslin was complaining of pain in the region of her great toe and was evaluated for stump neuroma or granuloma.  The MRI showed, inter alia, a fluid collection located between the first and second metatarsophalangeal joints.  An infection of the fluid collection could not be excluded.  (Tr. 374-375).

In a July 14, 2009 report, Dr. Loshigian noted that plaintiff could lift and carry up to ten pounds continuously, eleven to twenty pounds frequently, and twenty-one to fifty pounds occasionally.  The report also indicates that plaintiff could never crawl, but could bend, kneel and climb stairs occasionally, and reach above her shoulder continuously.  The report states that plaintiff could use both her hands and her right foot without difficulty but could not use her left foot to operate foot controls repetitively.  Dr. Loshigian concluded that, in an eight-hour day, Maslin could engage in light activities for three hours and sedentary activities for five hours.  (Tr. 365-366).

Dr. Scott Ellis

The plaintiff saw Dr. Scott Ellis on June 3, 2009, and reported to him that, one year earlier, she had woken up with pain in her left foot.  (Tr. 427-29).  She said she did not recall injuring her foot.  Dr. Ellis noted that Maslin had undergone two surgeries and had two incisions on her left foot; the first had healed but there was still some tenderness and minor swelling at the location of the scar; there was also tenderness at the second incision.  X-rays were taken and the result was normal.  Dr. Ellis also reviewed the plaintiff's recent MRI report and recommended nerve block injections and physical therapy.  (Tr. 428).

On July 13, 2009, Dr. Ellis provided an estimate of Maslin's functional ability: in an eight-hour workday, the plaintiff could do six to eight hours of sedentary activity and one hour of light activity. He further noted that the plaintiff could occasionally lift up to twenty pounds, but never more, and could use her hands without difficulty, but could not use her left foot for repetitive movement. (Tr. 1001).

In a July 17, 2009 progress note, Dr. Ellis observed that the plaintiff was again in extreme pain. He noted that the pain was very limiting, that she needed physical therapy, and that returning to her job as a teacher was not possible. He recommended that she see a pain management specialist. (Tr. 1003).

On October 5, 2009, Dr. Ellis again reported on plaintiff's ability to function, stating that, in an eight-hour workday, plaintiff could do sedentary activity for eight hours, but no light activity at all. (Tr. 1008).

Dr. Joel Kreitzer

Plaintiff was seen by Dr. Joel Kreitzer, a specialist in pain medicine, during the period July 2009 through December 2009. (Tr. 360-61, 430-31, 523-34). Dr. Kreitzer noted, during a July 9, 2009 examination, that plaintiff described the pain in the area of her left great toe as "deep, sharp, throbbing and tingling pain." She also complained of numbness and said that, on a scale of zero to ten, her pain level was ten, at worst, and eight, on average. He noted that plaintiff took medication for her back pain. He found good motor strength in all extremities and considered that plaintiff might have complex regional pain syndrome ("CRPS") of the left foot but, if so, it was "extremely localized, mild and atypical." (Tr. 361).

On September 2, 2009, Dr. Kreitzer administered a nerve block injection for pain in plaintiff's left foot. (Tr. 430-31). On December 23, 2009, plaintiff returned to Dr. Kreitzer, this

-6-

time complaining of pain in her neck and lower back. Plaintiff stated that her neck pain radiated into her shoulders and mid-back. On examination, plaintiff reported pain on motion of the cervical spine and positive trigger points along the right shoulder blade. Sensory functioning was intact. Dr. Kreitzer's impression was chronic neck and lower back pain. Dr. Kreitzer continued plaintiff's medications. (Tr. 294-95).

Dr. Steven Tay

On August 21, 2009, the plaintiff was examined by Dr. Steven Tay, an internist. She reported her history of pain in the left foot, right hand, back and shoulders. Dr. Tay referred the plaintiff to a rheumatologist. (Tr. 955).

On April 28, 2010, Dr. Tay completed a "disability status update" form for the plaintiff. Dr. Tay determined that the plaintiff could lift and carry up to ten pounds occasionally, could stand and walk occasionally, could twist, bend and stoop occasionally, could frequently reach above shoulder level but could not climb or operate heavy machinery. (Tr. 901-02).

Dr. Phillip Fyman

On August 25, 2009, the plaintiff was examined by Dr. Phillip Fyman in connection with her application for worker's compensation. On examination, Dr. Fyman noted that plaintiff was right hand dominant and alert, and that she had a bandage on her left foot and a slight limp, but was able to get on and off the examination table without assistance. (Tr. 306). He noted that she had a full range of motion of the cervical spine with minimal pain on extension and flexion and had some spasm and trigger point areas in the upper back and neck. He noted that she had full range of motion of her lumbosacral spine with some pain on palpation. Motor strength was full, at 5/5, in all muscle groups. Grip strength was also full, at 5/5 bilaterally. (Tr. 307). Reflexes were equal and symmetric in the upper and lower extremities. Dr. Fyman's impression was

myofascial pain and muscle spasm that had resolved in the upper back but persisted in the lower back. Dr. Fyman recommended a series of three trigger point injections in the lower back. In terms of functional abilities, Dr. Fyman stated that "there is no disability with regard to the patient's occupation, which is a teacher and no disability with regard to the activities of daily living." He noted that she was taking Vicodin, Soma and Ambien. (Tr. 308).

Dr. Russell L. Chin

Dr. Russell Chin examined the plaintiff on September 14, 2009. (Tr. 454). On examination, Dr. Chin found that plaintiff had full strength and normal tone in all extremities, although he found hypersensitivity to light touch and pinprick in the area of the left plantar surface. Dr. Chin evaluated the plaintiff's mental status and found that plaintiff's affect, memory, judgment and insight were normal. (Tr. 456).

On October 15, 2009, Dr. Chin prepared a report about plaintiff's ability to function, finding, inter alia, that she could perform sedentary activity for eight hours in an eight-hour work day and could perform light activity for about one hour in an eight-hour work day. (Tr. 439).

Dr. Isaac Cohen

On October 6, 2009, the plaintiff was examined by Isaac Cohen, M.D., an orthopedic surgeon, in connection with her application for worker's compensation. Dr. Cohen's examination focused on the plaintiff's complaints of pain in her neck, upper and lower back, shoulder and knee, and right hand. Dr. Cohen diagnosed right third metacarpalphalangeal joint sprain, resolved. (Tr. 301-304).

Dr. Daniel I. Richman

The plaintiff was seen by Dr. Daniel I. Richman, M.D., of The Hospital for Special Surgery, for a pain management consultation on October 9, 2009. Dr. Richman noted that

plaintiff was referred for evaluation and treatment, and for a second opinion regarding possible CRPS of the left foot lower extremity. On examination, Dr. Richman found "an exquisite tenderness" along the scar on the plaintiff's left foot. He noted that range of motion of the ankle was full but painful. He noted further that the range of motion of the cervical spine was full and free of pain. Neurological testing of the upper extremities revealed no motor or sensory deficits. Dr. Richman recommended lumbar sympathetic blocks and an MRI of the left foot. Dr. Richman strongly urged the plaintiff to taper off of Vicodin since he did not think it was helping her pain. The doctor's impression was probable CRPS of the left lower extremity. (Tr. 462-64, 1201-03).

Dr. Ira Bergman

Dr. Ira Bergman performed a psychiatric evaluation of the plaintiff on October 20, 2009. (Tr. 461, 465, 910). Dr. Bergman observed that her condition was "both perplexing and deeply concerning." (Tr. 461). He noted that he had previously diagnosed the plaintiff with obsessive compulsive disorder and had prescribed Amitriptyline to help her sleep and to reduce her pain. Dr. Bergman noted that she had wanted to reduce the medication because of supposed sexual side effects which Dr. Bergman stated was "an extremely unusual side effect from such a low dose of this medication." Dr. Bergman reported that the plaintiff requested benzodiazepine, which concerned him given the number of soporific and respiratory suppressing medications she was taking. He stated that "[t]he tenor of her appointment today left me to feel that there is clear drug seeking behavior." (Tr. 461).

Dr. Ifeoma M. Okoronkwo

In December 2009, the plaintiff received a series of nerve block injections from Dr. Ifeoma M. Okoronkwo. (Tr. 297-300).

Physical and Occupational Therapy

During the period from February 23, 2010, through March 15, 2010, the plaintiff underwent physical and occupational therapy for her foot, hand and back. (Tr. 685-878). On March 1, 2010, physical therapist Cara Sieberth noted that the plaintiff's weight bearing was grossly equal, right to left, but that she often stood without weight on her left foot. Sieberth's assessment was "somatic, [n]ot working up to potential, pain behaviors." (Tr. 746).

On March 2, 2010, Sieberth noted that the plaintiff was holding the right side of her neck during her class and that she was able to walk several laps around the gym. On March 9, 2010, occupational therapist Michelle Wilson noted that the plaintiff's right upper extremity strength and active range of motion had significantly improved. Wilson noted that the plaintiff's lifting ability had increased from zero to eight pounds from an eight-inch stool and her carrying ability had increased from three to ten pounds for twenty feet. (Tr. 705).

On March 11, 2010, Sieberth reported that the plaintiff's effort during her physical therapy was marginal to fair. In the March 15, 2010 discharge summary, Sieberth wrote that, although the plaintiff's pain behaviors diminished during treatment, she remained self-limiting. (Tr. 685).

Dr. Aurelio Salon

On March 22, 2010, the plaintiff was examined by Aurelio Salon, M.D., at the Commissioner's request. (Tr. 343-47). On examination, Dr. Salon observed that the plaintiff had a normal gait and appeared to be in no acute distress. She was able to walk on heels and toes without difficulty, had a normal stance, and used no "assistive devices."

On further examination, Dr. Salon found that the plaintiff had a full range of motion of the cervical and lumbar spine and of the upper and lower extremities. A neurological examination

-10-

revealed no motor or sensory deficits. Examination of the plaintiff's hands revealed intact dexterity and full grip strength. A review of the plaintiff's foot revealed an erythema of the left big toe with tenderness to touch.

Based on his findings, Dr. Salon stated that the plaintiff was not restricted in her ability to sit but her ability to stand and her capacity to climb, push, pull, or carry heavy objects would be restricted because of the status post surgery for neuroma and RSD. (Tr. 344-47).

Medical Evidence Submitted to the Appeals Council

The plaintiff submitted over 100 pages of medical evidence to the Appeals Council after the ALJ issued his decision. (Tr. 1193-1310). As the defendant notes, some of this evidence duplicates evidence already contained in the record, for example, Dr. Richman's October 9, 2009 report (Tr. 1201-1203), Dr. Bergman's October 20, 2009 report (Tr. 1262), and physical therapist Sieberth's March 15, 2010 discharge and physical therapy notes (Tr. 1246-58). Additionally, the plaintiff submitted evidence of treatment provided prior to and following the period at issue, for example, reports dated 2006 and 2007 (prior to the relevant period) and a letter prepared by Dr. Loshigian on July 26, 2011, after the period at issue (which closed with the ALJ's April 29, 2011 decision).

Evidence from the relevant period provided to the Appeals Council included numerous laboratory blood test reports, and records from Grammercy Park Physicians with whom her internist, Dr. Tay was affiliated. A June 8, 2010 report from Dr. Tay shows that plaintiff was treated for constipation. (Tr. 1213-15). Progress notes also show largely normal physical examinations on September 28, 2009, October 8, 2009, November 10, 2009, December 19, 2009, March 24, 2010 and September 27, 2010. (Tr. 1222-1230).

The plaintiff also submitted a February 28, 2010 letter from Dr. Loshigian excusing her from serving as a juror. (Tr. 1307). Dr. Loshigian explained that Maslin had chronic pain which may interfere with her ability to concentrate.  In addition, on February 28, 2011, Dr. Kreitzer also provided a medical excuse note for jury duty.  Dr. Kreitzer stated that the plaintiff's lumbar radiculopathy made it difficult for her to sit for long periods of time. (Tr. 1308).

***ALJ's Decision***

The issue before the ALJ was whether Maslin was disabled from February 9, 2009 to the date of the decision.  (Tr. 15).  The ALJ determined that Maslin: (1) meets the insured status requirements of the SSA through December 31, 2014; (2) has not engaged in substantial gainful activity since February 9, 2009; (3) has the following severe impairments: chronic neck and lower back pain, pain in the shoulders, right third metacarpophalangeal joint sprain, and left foot RSD, status post surgeries; (4) does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a);[5] and (6) is unable to perform past relevant work.  The ALJ further determined that, taking into consideration Maslin's age, education, past work experience and residual functional capacity, she is able to do other work and other work exists in significant numbers in the national economy that she can perform.  (Tr. 26-31).

In determining Maslin's residual functioning capacity, the ALJ stated that he "considered

---

[5] Sedentary work is defined as "work [that] involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] also considered opinion evidence." (Tr. 27). Although the ALJ determined that Maslin's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he found that Maslin's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with his findings regarding Maslin's residual functional capacity for sedentary work. (Tr. 27-28).

In making his finding, the ALJ reviewed Maslin's medical history prior to February 2009 and also cited the reports of the medical professionals who examined Maslin, including Dr. Ellis, Dr. Tay, Dr. Chin, Dr. Loshigian, Dr. Fyman, Dr. Cohen, Dr. Kreitzer and Dr. Salon, as well as the reports of the physical and occupational therapists who worked with Maslin. The ALJ noted, for example, that Maslin underwent left foot neuroma resection on February 10, 2009, followed by a second left foot surgery in April 2009. The ALJ noted that following her first surgery, Maslin traveled to Florida. He also noted that "RSD set in which has resulted in her foot being hypersensitive and also makes it difficult for her to walk more than 5 minutes at a time." (Tr. 28). The ALJ cited medical records prepared by Dr. Ellis during the period from June through September, 2009, and those prepared by Dr. Kreitzer in July 2009, reporting Maslin's left foot RSD. The ALJ cited a July 2009 report prepared by Dr. Loshigian in which he stated that "the claimant could lift and carry 1-10 pounds continuously, 11-20 pounds frequently, and 21-50 pounds occasionally." The ALJ also referred to a report prepared by Dr. Ellis stating that "the claimant could perform sedentary activities for 5 hours in an 8-hour workday, and light activities for 3 hours in an 8-hour workday." (Tr. 28). The ALJ noted further that, in October 2009, Dr. Chin stated that "the claimant could lift and carry 20 pounds occasionally, reach above shoulder

level frequently, push/pull up to 10 pounds occasionally, and bend, kneel, crawl or climb occasionally [and] [h]as no problem with her hands." (Tr. 28).

The ALJ also noted that, in Dr. Chin's opinion, the claimant could do sedentary activity for eight hours in an eight-hour day and light activity for one hour in an eight-hour workday. (Tr. 28). The ALJ also found that reports from August through October 2009 supported these opinions. Specifically, Dr. Fyman stated that Maslin "walked with only a slight left foot limp and has no difficulty getting on and off the examination table." In Dr. Fyman's opinion, he noted, Maslin had no disability with regard to working as a teacher. The ALJ further noted that a September 2009 "electrodiagnostic study was minimally abnormal with regard to the legs and right arm and indicated only local trauma to the left foot with no evidence of generalized polyneuropathy." He stated further that "[a]n October 15, 2009 MRI of the left foot showed post-operative changes of the medical margin with no evidence of neuroma." (Tr. 29).

The ALJ also cited the opinion of the consultative examiner, Dr. Salon, that Maslin "had a normal gait and stance and was able to heel and toe walk without difficulty" but that, while she could sit, she would be "restricted in standing, climbing, pushing, pulling and carrying heavy objects due to RSD." The ALJ also made reference to the physical and occupational therapy reports from the period February 26 to March 11, 2010, which "often note that [Maslin] was somatic, self-limiting, not working up to her potential, and exhibiting pain behaviors." The ALJ noted the observation of physical therapist Cara Sieberth that Maslin reported that "her posture was improving and that she went out to dinner and exercised over the weekend [and] [o]n March 2, 2010 . . . walked for several laps around the gym to cool down [and] [o]n March 3, 2010 . . . was barefoot and had no gait deviations." (Tr. 29).

In his recitation of the evidence, the ALJ took note of reports concerning Maslin's pain

-14-

symptoms.  For example, the ALJ noted that: (a) in June 2003, Maslin "complained of

excruciating left foot pain" (Tr. 19); (b) in August 2009, Maslin "complained of pain radiating into

her shoulders, middle and low back pain, knee pain and bilateral hand pain" (Tr. 19); (c) in

September 2009, Maslin "reported that her pain, which was significant before, has now gotten

worse" (Tr. 20); and (d) in February 2010, Dr. Tay stated that Maslin "has severe shoulder, neck,

and back pain, and struggles to sleep without Ambien." (Tr. 23).

      The ALJ noted that while Maslin had testified that she suffered from fibromyalgia, the

record did not document such fibromyalgia symptoms as "multiple trigger points."  He further

noted that Maslin said she had poor short-term memory, but when asked for an example stated that

"she sometimes walks into a room and forgets the reason why she went into the room [and] the

undersigned notes that this is a very common experience all people have."  Additionally, the ALJ

noted, "the claimant lives with roommates . . . tries to get out of her apartment each day,

sometimes to visit a friend."  Also, "[t]he claimant socializes with her roommates . . . does grocery

shopping . . . is able to buy and carry small loads . . . [and] has a cleaning lady but is able to do

light cooking [and] is able to drive a car and does so regularly." (Tr. 30).

      Regarding evidence submitted post-hearing, the ALJ noted that the "[o]nly significant

matter not previously raised was a report from a consulting psychiatrist noting that [she] seemed to

be engaging in classic drug-seeking behavior in an attempt to obtain additional benzodiazepines."

(Tr. 30).  The ALJ concluded: "In sum, [she] has a serious problem with her left foot, which

undoubtedly limits her in some respects, but based upon her activities of daily living, such as

cooking, shopping, driving, and visiting friends, and the medical evidence, such as reports from

Dr. Ellis, Dr. Tay, Dr. Chin and Dr. Salon, as well as the September 16, 2009 electrodiagnostic

study, the undersigned finds that [Maslin] is not disabled."  (Tr. 30).  The ALJ then concluded that,

taking into account Maslin's extensive treatment for RDS, "including nerve blocks and heavy pain medication," Maslin could perform sedentary work.

The ALJ then noted that Maslin's past relevant work was as a special education teacher but that, since she is limited to sedentary work, she is now unable to perform that type of work. (Tr. 30). The ALJ also noted that Maslin was 28 years old on the date of the onset of her alleged disability, that she has at least a high school education and that she is able to communicate in English. Based on this assessment, the ALJ found that "[b]ased on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of not disabled is directed by Medical-Vocational Rule 201.28." (Tr. 31).

### Commissioner's Motion for Judgment on the Pleadings

The Commissioner contends that substantial evidence exists in the record to support the ALJ's finding that Maslin is not disabled and has the residual functional capacity for sedentary work. The Commissioner contends further that substantial evidence exists in the record to support the ALJ's finding that Maslin's subjective complaints are not credible to the extent alleged and that, although she is unable to do her past work as a teacher, there is a significant number of jobs in the national economy that she can perform. The Commissioner also argues that the evidence submitted to the Appeals Council did not provide a basis for changing the ALJ's decision. Therefore, the Commissioner maintains, the ALJ's determination, that Maslin is not entitled to the benefits she seeks, should be affirmed.

### Plaintiff's Opposition

In opposition to the defendant's motion, the plaintiff submitted a letter explaining how the Appeals Council made a wrong decision in her case. She states that her pain has gotten much worse since she originally applied for benefits, that she is spending more time in bed due to pain,

and that her foot has become much more hypersensitive.  She states that she is not able to have a job because she is unable to sleep because of her pain and therefore cannot get up in the morning. She reports that she still must wear a surgical shoe from her surgery three years ago.  She also states that her financial situation has worsened, that she has no insurance, and that her memory is bad and she cannot remember her thoughts from one moment to the next.  She states that she takes medications for these symptoms but they only work some of the time and that sometimes they "kick in very hard" and that she is then "completely out of it" and "can't work like that."  The plaintiff also provided a letter she wrote in November 2011, describing her symptoms at that time.

## DISCUSSION

### *Legal Standard*

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error.  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations and internal quotation marks omitted).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted).  "It is not the function of a reviewing court to decide de

novo whether a claimant was disabled, or to answer in the first instance the inquiries posed by the
five-step analysis set out in the [Social Security Administration] regulations." Melville v. Apfel,
198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

To qualify for disability benefits, an individual must be unable "to engage in any
substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The
Commissioner must consider both objective and subjective factors when assessing a disability
claim, including: (1) objective medical facts; (2) diagnoses and medical opinions based on such
facts; (3) subjective evidence of pain or disability to which the claimant or others testify; and (4)
the claimant's educational background, age and work experience. See Brown v. Apfel, 174 F.3d
59, 62 (2d Cir. 1999).

The Social Security Administration's regulations establish a five-step process for
determining a disability claim. See 20 C.F.R. § 404.1520(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security
> Administration] will not review the claim further. At the first step, the agency will
> find nondisability unless the claimant shows that he is not working at a "substantial
> gainful activity." At step two, the [Social Security Administration] will find
> nondisability unless the claimant shows that he has a "severe impairment," defined as
> "any impairment or combination of impairments which significantly limits [the
> claimant's] physical or mental ability to do basic work activities." At step three, the
> agency determines whether the impairment which enabled the claimant to survive step
> two is on the list of impairments presumed severe enough to render one disabled; if so,
> the claimant qualifies. If the claimant's impairment is not on the list, the inquiry
> proceeds to step four, at which [time] the [Social Security Administration] assesses
> whether the claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled. If the claimant survives the fourth stage, the fifth, and
> final, step requires the [Social Security Administration] to consider so-called
> "vocational factors" (the claimant's age, education, and past work experience), and to

determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) (citations omitted).

"[T]he ALJ generally has an affirmative obligation to develop the administrative record."

Melville, 198 F.3d at 51 (citation omitted).   If the ALJ finds that the claimant's "impairment(s) does not meet or equal a listed impairment, [the ALJ] will assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step, that other gainful work exists in the national economy, which the claimant could perform.  See Balsamo v Chater, 142 F.3d 75, 80 (2d Cir. 1998).

> In meeting her burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's [residual functional capacity] in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  In the ordinary case, the ALJ may rely exclusively on the Grid in order to determine whether a claimant retains the residual functional capacity to perform some work other than his or her past work.  See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).  However, "exclusive reliance on the [Grid] is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." Id. (citation and internal quotation marks omitted).

-19-

When the medical findings indicate that a claimant has a medically determinable impairment that could reasonably be expected to produce symptoms such as pain, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine how those symptoms limit the claimant's capacity to work. See 20 C.F.R. § 404.1529(c)(1). The ALJ must always attempt to obtain objective medical evidence in determining the intensity and persistence of the claimant's symptoms. See 20 C.F.R. § 404.1529(c)(2). Since symptoms may suggest a greater severity of impairment than can be shown by objective medical evidence alone, the ALJ must consider other evidence about the symptoms, including the following factors relevant to the symptoms: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factor concerning the claimant's functional limitations and restrictions due to pain or other symptoms. See 20 C.F.R. § 404.1529(c)(3). The claimant's statements about the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. See 20 C.F.R. § 404.1529(c)(2).

With regard to a claimant's credibility, "[w]hen determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).

-20-

*Application of Legal Standard*

Maslin's Residual Functional Capacity

The ALJ found that Maslin is not disabled and has the residual functional capacity to perform sedentary work. The ALJ made a finding respecting Maslin's residual functional capacity because he concluded that Maslin's impairments do not meet or equal the requirements of any listed impairment. See 20 C.F.R. Part 404, Subpart P, Appendix 1; 20 C.F.R. § 404.1520(c). The ALJ then determined that, although the plaintiff cannot do her past work as a teacher, taking into consideration her age, education, work experience and residual functional capacity, the plaintiff can do other work and other work exists in significant numbers in the national economy that she can perform.

The ALJ's finding that the plaintiff can perform sedentary work is supported by substantial evidence. In making this determination, the ALJ discussed the plaintiff's ability to perform functions associated with sedentary worked as defined by the SSA, including her ability to carry 1-10 pounds continuously, 11-20 pounds frequently and 21-50 pounds occasionally. The ALJ also noted, inter alia, the opinion of Dr. Chin that Maslin could perform sedentary activities for eight hours in an eight-hour workday and light activity for one hour in an eight-hour workday. This determination, the ALJ noted, was supported by reports of other physicians, including Dr. Fyman. The ALJ's finding was also consistent with the opinion of Dr. Salon, the consultative examiner, and the reports of the physical and occupational therapists who worked with Maslin. Thus, while the medical evidence showed clearly that Maslin suffers from certain physical impairments, it does not appear that any of these impairments are so severe as to prevent her from performing sedentary work.

<u>The ALJ's Credibility Finding</u>

  The ALJ found Maslin's testimony about the intensity, persistence and limiting effects of her symptoms not credible, to the extent that such testimony was inconsistent with his findings regarding Maslin's residual functional capacity to perform sedentary work.  Here, the ALJ's determination of Maslin's credibility is also supported by substantial evidence.  The ALJ weighed properly Maslin's subjective complaints of symptoms indicating total disability with medical evidence that seemed to suggest only partial limitations, as well as Maslin's own testimony, which demonstrated that she was capable of performing a wide variety of daily activities.  For example, while the ALJ took note of Maslin's statements regarding her pain symptoms and short-term memory problems, he also noted that, according to the physical and occupational therapists who had worked with Maslin, she had a tendency to engage in pain behaviors and to avoid working up to her potential, and that her condition improved as she engaged in more exercise so that she was able to exceed her limitations.  The ALJ also took into consideration Maslin's own testimony concerning the activities she engaged in on a daily basis, noting that she was able to cook, do small loads of laundry and light shopping, socialize with friends, go out to dinner and drive a car.

  Furthermore, it appears that the ALJ determined properly that other work exists in the national economy that Maslin can perform.  In arriving at this determination, the ALJ considered Maslin's age, level of education, ability to communicate in English and exertional limitations.  The ALJ then applied Rule 201.28 of the Medical-Vocational Guidelines, which he was entitled to do because, in this case, the guidelines account for the full extent of Maslin's physical limitations, as reflected in her ability to perform sedentary work, and the relevant vocational factors.

<u>Evidence Submitted to the Appeals Council</u>

Under the regulations, where new and material evidence is submitted to the Appeals Council, the Council will consider the evidence "only where it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b). The Appeals Council will then review the case "if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." <u>Id</u>.

In this case, the evidence that was neither cumulative nor outside the relevant period did not make the ALJ's decision contrary to the weight of the evidence. Therefore, the Appeals Council did not err in refusing to review the ALJ's decision.

## RECOMMENDATION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings, Docket Entry No. 16, be granted.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken, 40 Centre Street, Room 2101, New York, New York 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York 10007. *Any requests for an extension of time for filing objections must be directed to Judge Oetken. Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.* <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 470 (1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v.</u>

Canadair Ltd., 838 F.2d 55, 58-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated: New York. New York
      March 14, 2014

Respectfully submitted,

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Copy mailed to:

Stephanie Maslin